FILED
07/31/2018
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 13, 2017

## WILLIAM DARRYN BUSBY v. STATE OF TENNESSEE

Appeal from the Circuit Court for Lewis County
No. 2002-CR-105, 6650    Joseph Woodruff, Judge

_____

### No. M2017-00943-CCA-R3-ECN

_____

The Petitioner, William Darryn Busby, filed a petition for a writ of error coram nobis in the Lewis County Circuit Court, asserting that newly discovered evidence entitled him to a new trial. The coram nobis court summarily dismissed the petition, and the Petitioner appeals. Based upon the record and the parties' briefs, we conclude that the coram nobis court's summary dismissal of the petition must be reversed and the case remanded to the coram nobis court for an evidentiary hearing to determine whether due process principles require tolling the statute of limitations.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Case Remanded**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, J., joined. TIMOTHY L. EASTER, J., not participating.

William Darryn Busby, Only, Tennessee, Pro Se.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; Kim R. Helper, District Attorney General; and Jennifer Mason, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

In 2003, a Lewis County Circuit Court Jury convicted the Petitioner of four counts of rape of a child. At trial, the then ten-year-old male victim testified that the Petitioner was his mother's boyfriend and lived with them at the time of the crimes. State v. William Darryn Busby, No. M2004-00925-CCA-R3-CD, 2005 WL 711904, at *1 (Tenn. Crim. App. at Nashville, Mar. 29, 2005), perm. app. denied, (Tenn. Aug. 25, 2008).

During the first incident, the Petitioner pulled down the victim's underwear in the victim's bedroom and licked the victim's penis while the victim's mother was asleep. Id. For the second incident, which occurred while the Petitioner and the victim were watching a movie in the living room, the Petitioner forced the victim to put his mouth on the Petitioner's penis until the Petitioner ejaculated. Id. The victim testified that for the third incident, he heard the Petitioner yelling at someone on a cellular telephone, the Petitioner hung up the telephone, and the Petitioner forced him to put his mouth on the Petitioner's penis. Id. During the final incident, which occurred while the victim's mother was at work, the Petitioner "squirted" some lotion into the victim's "'bottom'" and put his penis inside the victim's anus for about five minutes. Id. The victim stated that he revealed the abuse to his mother after his mother and the Petitioner "had a big fight" and the Petitioner was "'gone.'" Id. at *2. He said he did not tell his mother about the abuse earlier because the Petitioner "had threatened to beat him." Id.

The victim's mother testified at trial that the Petitioner began living with her and the victim in April 2001 and that he was home alone with the victim on Sundays while she worked. Id. In July 2002, she and the Petitioner had a fight, the Petitioner "'slung'" her and cursed at her in front of the victim, and she told the Petitioner to leave. Id. The next day, the victim revealed the abuse to her. Id. The victim's mother said that during a telephone call with the Petitioner, he admitted the victim's allegations. Id. A nurse practitioner, who examined the victim after he revealed the abuse, testified for the State that she found no medical evidence of oral or anal penetration. Id. The Petitioner testified and "steadfastly" denied abusing the victim. Id. at *3. He also denied slinging the victim's mother or admitting to her that he abused the victim. Id. at *3.

On direct appeal of his convictions to this court, the Petitioner claimed only that the trial court committed reversible error by failing to instruct the jury on the State's election of offenses.[1] Id. at *1. This court found that the trial court erred but that the error was harmless. Id. at *7.

The Petitioner filed a petition for post-conviction relief, arguing that he received the ineffective assistance of trial and appellate counsel. William Darryn Busby v. State, No. M2012-00709-CCA-R3-PC, 2013 WL 5873276, at *1 (Tenn. Crim. App. at Nashville, Oct. 30, 2013), perm. app. denied, (Tenn. Mar. 5, 2014). At the Petitioner's evidentiary hearing, various witnesses testified, including the Petitioner's trial and appellate counsel and the victim's mother. Id. at *3. Trial counsel testified that one of his main defense theories at trial was that the victim was not credible. Id. The victim's mother testified at the evidentiary hearing that she told the victim to tell the truth and that

---

[1] The victim testified at trial about five incidents of abuse.

she did not tell him what to say at trial.  Id. at *7.  The post-conviction court denied relief, and this court affirmed the judgment of the post-conviction court.  Id. at *22.

In February 2017, the Petitioner filed a pro se petition for a writ of error coram nobis, alleging newly discovered evidence to support his longstanding claim that the victim's mother, G.T., fabricated the sexual abuse allegations to retaliate against him for their bitter breakup.  The Petitioner acknowledged filing the petition almost thirteen years after his judgments of conviction became final but argued that the statute of limitations should be tolled.  Specifically, the Petitioner alleged in the petition as follows:

> The Office of the Federal Public Defender for the Middle District of Tennessee was appointed to represent [the Petitioner on] June 17, 2014.  On March 4, 2015, [the Petitioner], through his appointed counsel, filed a timely amended petition for a writ of habeas corpus in the United States District Court for the Middle District of Tennessee.  Over the next year and a half, an investigator with the Federal Public Defender's Office conducted a thorough investigation of [the Petitioner's] case.  In the spring of 2016, another witness suggested that the investigator speak to Johnny Lay, [G.T.'s] estranged husband.  In an initial interview, Mr. Lay revealed that he had witnessed [C.T.] studying a sort of cheat sheet - created by his mother, [G.T.] - that highlighted the key details of the sexual abuse allegations against [the Petitioner].  The investigator obtained an affidavit from Mr. Lay on August 24, 2016.  Shortly thereafter, the investigator spoke with Darla Sisco, who corroborated Mr. Lay's account.  Ms. Sisco provided an affidavit on September 28, 2016.

The Petitioner stated in the petition that he had no reason to know about the "cheat sheet" until his investigator learned about it from Mr. Lay.

The Petitioner attached the two affidavits to his petition.  In Mr. Lay's affidavit, he stated that he and G.T. were still married but that they had been "living separately for some time."  Mr. Lay and G.T. began dating in early 2003.  In the summer of 2003, while the Petitioner was awaiting trial, Mr. Lay was spending nights at G.T.'s home and regularly saw the victim "studying a cheat sheet that summarized key details of the allegations against Mr. Busby."  The cheat sheet was in G.T.'s handwriting, covered the entire page of a legal pad, and "included such details as:  (a) Mr. Busby got lotion out of the drawer, and (b) white stuff came out of his penis."  Mr. Lay also stated that he confronted G.T. about the cheat sheet, that he expressed concern to her about the Petitioner's being convicted of a crime the Petitioner did not commit, and that G.T. "became angry and it always turned into an argument."  Mr. Lay stated that he regretted not coming forward with the information earlier and that he had been "haunted" for years

by the possibility that the jury wrongfully convicted the Petitioner. In Ms. Sisco's affidavit, she stated that she dated Mr. Lay from 1998 to 2003 and that they were engaged to be married. Ms. Sisco ended her relationship with Mr. Lay after he began "seeing" G.T., but they remained friends. "Some months" after Mr. Lay and Ms. Sisco broke up, he told her that "[G.T.] had a piece of paper for her son so that he could memorize details of the abuse allegations against [G.T.'s] former boyfriend." Ms. Sisco stated that "Mr. Lay was troubled about the piece of paper and was venting to me about this."

The State responded to the petition, arguing that it was untimely and that the statute of limitations should not be tolled because the Petitioner knew of Mr. Lay during the investigation of his case and at the time of trial but chose not to interview him; therefore, the Petitioner failed to show that he was without fault in failing to present the newly discovered evidence at the appropriate time. In a brief written order, the trial court found that the petition was untimely. The court then found that, in any event, "the Petition would still be denied because the Petitioner failed to allege newly discovered evidence that would have resulted in a different judgment." On appeal, the Petitioner challenges the summary dismissal of the petition for a writ of error coram nobis and requests that that we remand the case for a hearing to determine whether due process principles require tolling the statute of limitations.

## II. Analysis

The writ of error coram nobis is codified in Tennessee Code Annotated section 40-26-105 and provides as follows:

> There is hereby made available to convicted defendants in criminal cases a proceeding in the nature of a writ of error coram nobis, to be governed by the same rules and procedure applicable to the writ of error coram nobis in civil cases, except insofar as inconsistent herewith . . . . Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Tenn. Code Ann. § 40-26-105(a), (b).

Our supreme court outlined the procedure that a trial court considering a petition for a writ of error coram nobis is to follow:

> [T]he trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result.

State v. Vasques, 221 S.W.3d 514, 527 (Tenn. 2007). In determining whether the new information may have led to a different result, the question before the court is "'whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different.'" Id. (quoting State v. Roberto Vasques, No. M2004-00166-CCA-R3-CD, 2005 WL 2477530, at *13 (Tenn. Crim. App. at Nashville, Oct. 7, 2005)). Generally, a decision whether to grant a writ of error coram nobis rests within the sound discretion of the trial court. Id.

A writ of error coram nobis must be filed within one year after the judgment becomes final in the trial court. Tenn. Code Ann. § 27-7-103. Nevertheless, the statute of limitations may be tolled on due process grounds if a petition seeks relief based upon newly discovered evidence of actual innocence. Wilson v. State, 367 S.W.3d 229, 234 (Tenn. 2012). Our supreme court has stated that "[i]n determining whether tolling of the statute is proper, the court is required to balance the petitioner's interest in having a hearing with the interest of the State in preventing a claim that is stale and groundless." Id. In general, "'before a state may terminate a claim for failure to comply with . . . statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner.'" Id. (quoting Burford v. State, 845 S.W.2d 204, 208 (Tenn. 1992)). Our supreme court described the three steps of the "Burford rule" as follows:

> "(1) determine when the limitations period would normally have begun to run; (2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and (3) if the grounds are 'later-arising,' determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim."

- 5 -

Id. (quoting Sands v. State, 903 S.W.2d 297, 301 (Tenn. 1995)). Whether due process considerations require tolling the statute of limitations is a mixed question of law and fact, which we review de novo with no presumption of correctness. Harris v. State, 301 S.W.3d 141, 145 (Tenn. 2010).

Turning to the instant case, the coram nobis court did not dismiss the petition on the basis that it failed to allege newly discovered evidence. Instead, the court dismissed the petition because it was untimely. However, the court did not address the Petitioner's due process claim and whether the three-step Burford Rule warranted tolling the statute of limitations.

Here, the Petitioner acknowledges that his petition was filed well-outside the one-year statute of limitations but asserts that due process principles require tolling the statute of limitations because he did not learn about Mr. Lay's information regarding the cheat sheet until sometime after the spring of 2016, when the investigator for his federal habeas corpus claim interviewed Mr. Lay. The State contends that tolling is not required because the Petitioner knew at the time of trial that G.T. was in a new relationship and, therefore, the Petitioner could have found Mr. Lay before trial. In support of its claim, the State notes that at trial, the Petitioner's attorney asked the Petitioner about G.T.'s "new boyfriend." In its appellate brief, the State deduces from the timing in Mr. Lay's affidavit that the "new boyfriend" must have been Mr. Lay. However, whether the Petitioner knew that G.T.'s new boyfriend was Mr. Lay is not in evidence. Finally, the State asserts that tolling is not required because the Petitioner's main defense at trial was that the victim was coached by G.T.; therefore, his claim of newly discovered evidence would only attack the victim's credibility. As our supreme court has explained, though:

> Although not specifically addressed by the parties, it is our further view that whether the testimony qualifies as impeachment evidence may be relevant in the determination [of whether coram nobis relief is warranted] but is not controlling. Cf. State v. Sheffield, 676 S.W.2d 542, 549 (Tenn. 1984); State v. Arnold, 719 S.W.2d 543, 550 (Tenn. Crim. App. 1986). Impeachment evidence might be particularly compelling under the circumstances of a particular case. Moreover, a complete restriction on the availability of coram nobis relief in the case of any newly discovered impeachment evidence would be inconsistent with the discretion afforded to our trial courts. Finally, the language of Tennessee Code Annotated section 40-26-105 makes no distinction between impeachment evidence and all other evidence. Thus, the ultimate question is the effect of

the newly discovered evidence on the outcome when viewed under the standards in <u>Mixon</u>, our decision in <u>Workman</u>, and our analysis in this case.

<u>Vasques</u>, 221 S.W.3d at 528.

The coram nobis court in the instant case also went on to find, without any evidence having been admitted at a hearing, that the petition failed to allege newly discovered evidence that would have resulted in a different judgment. We note that coram nobis claims are "singularly fact-intensive," are not easily resolved on the face of the petition, and often require a hearing. <u>Harris v. State</u>, 102 S.W.3d 587, 593 (Tenn. 2003). Regardless, the correct standard is whether the jury "may have" reached a different result, not whether the jury "would have" reached a different result. Thus, the coram nobis court used the wrong standard to deny the petition on its merits.

Accordingly, we conclude that the coram nobis court erred by summarily dismissing the petition and that this case must be remanded for a hearing to determine whether due process principles required tolling the statute of limitations. In the event the coram nobis court determines that the statute of limitations must be tolled, the court shall conduct an evidentiary hearing on the merits of the petition.

### III.  Conclusion

Based upon the record and the parties' briefs, the coram nobis court's summary dismissal of the petition for a writ of error coram nobis is reversed, and the case is remanded to the court for further proceedings consistent with this opinion.

_____
NORMA MCGEE OGLE, JUDGE